## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Norlyn Stanley Nelson,                                 File No. 11-cv-3143 (DSD/TNL)

        Plaintiff,

v.                                                                  **REPORT &**
                                                                     **RECOMMENDATION**

James Stuart,
Sheriff Anoka County,

The Anoka County Jail, and

Doctor John Loes,
Anoka County Jail Doctor,

        Defendants.

---

Norlyn Stanley Nelson, MCF-Faribault, 1101 Linden Lane, Faribault, MN 55021;

Robert D. Goodell and Bryan D. Frantz, Anoka County Attorney's Office, 2100 3rd Avenue North, Anoka, MN 55303 (for Defendants James Stuart and Anoka County Jail); and

Bryon G. Ascheman and Richard J. Thomas, Burke & Thomas PLLP, 3900 Northwoods Drive, Suite 200, St. Paul, MN 55112 (for Defendant Doctor John Loes).

---

      This matter is before the Court, United States Magistrate Judge Tony N. Leung, on

Defendant Anoka County Sheriff James Stuart's ("Sheriff Stuart") Motion for Summary

Judgment (Docket No. 80) and Defendant Doctor John Loes's Motion for Summary

Judgment (Docket No. 93). These motions have been referred to the undersigned for a

report and recommendation to the District Court, the Honorable David S. Doty, District

Judge for the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. LR 72.1.

## I.

A number of significant events have occurred since the filing of the Amended Complaint (Am. Compl., Docket No. 10).

First, Sheriff Stuart and Defendant Anoka County Jail moved for dismissal pursuant to Fed. R. Civ. P. 12(b)(6).  (Docket No. 13.)  Judge Doty adopted this Court's report and recommendation in its entirety, thereby granting the motion to dismiss with respect to Anoka County Jail and denying the motion with respect to Sheriff Stuart. (Docket Nos. 31, 36.)

Second, Plaintiff Norlyn Stanley Nelson ("Nelson") moved to amend his Amended Complaint.  (Docket No. 51.)  Nelson's motion to amend was granted in part on March 22, 2013 and, to date, Nelson has not filed a Second Amended Complaint. When leave to amend has been granted by this Court, the Local Rules require the moving party to file and serve the amended pleading.  D. Minn. LR 15.1(b).  Because Nelson has not filed a Second Amended Complaint, the Amended Complaint remains the operative complaint in this matter.[1]  As this Court previously stated, "[n]otwithstanding his pro se

---

[1] Recently, Nelson filed a document entitled "Notice of Clarification of Complaint," in which Nelson states that it was his understanding that, because he filed a "Motion to *Amend* (not a motion to *file* an amendment)," the copy of his proposed Second Amended Complaint filed along with his motion to amend "is now the operative complaint," just "*with* the parts granted and *without* the parts denied." (Notice of Clarification at 1, Docket No. 110.) Throughout the course of this litigation, Nelson has repeatedly sought legal advice from the Court. (Jan. 14 Ord. at 1 n.1, Docket No. 43.)  The Court has responded by providing Nelson with a copy the Prisoner Civil Rights Federal Litigation Guidebook, available at http://www.mnd.uscourts.gov/Pro-Se/PrisonerCivilRightsLitigGuide.pdf, which Nelson acknowledged receiving, and indicated that the Court could not provide Nelson with legal advice.  (*Id.*; *see also* January 30, 2013 Ord. at 2, Docket No. 50; Ltr. from the Hon. Tony N. Leung, United States Magistrate Judge, April 5, 2013, Docket No. 69.)  Notably, the Guidebook discusses the procedure for filing an amended complaint once leave has been granted.  (Guidebook at 26.)  Further, the Court, Sheriff Stuart, and Dr. Loes have at various

status, [Nelson] must follow the Federal Rules of Civil Procedure and Local Rules of this Court . . . ."   (Dec. 5 Ord. Op. at 12.)   *See Meehan v. United Consumers Club Franchising Corp.*, 312 F.3d 909, 914 (8th Cir. 2002) ("All civil litigants are required to follow applicable procedural rules."); *Lindstedt v. City of Granby*, 238 F.3d 933, 937 (8th Cir. 2000) (per curiam) ("A pro se litigant is bound by the litigation rules as is a lawyer . . . ."); *Silberstein v. Internal Revenue Serv.*, 16 F.3d 585, 860 (8th Cir. 1994) ("local rules . . . are binding on the parties").

## II.

Nelson brings this action under 42 U.S.C. § 1983, alleging that Sheriff Stuart and Dr. Loes have violated his right to be free from cruel and unusual punishment under the Eighth Amendment of the United States Constitution.   (Dec. 5, 2013 Order Op. at 2.) The Court sets forth the facts in the light most favorable to Nelson.   *See Tommassello v. Stine*, No. 08-cv-1190 (PJS/RLR), 642 F. Supp.2d 910, 912 (D. Minn. 2009); *id.* at 917 ("In considering a motion for summary judgment, a court 'must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the non-moving party.'" (quoting *Winthrop Res. Corp. v. Eaton Hydraulics, Inc.*, 361 F.3d 465, 468 (8th Cir. 2004))).

From November 14, 2010 to October 24, 2011, Nelson was incarcerated in the Anoka County Jail as a pretrial detainee pending resolution of criminal charges and a

---

times all noted that Nelson had not yet filed a Second Amended Complaint despite having been given leave to do so. (*See, e.g.*, Sheriff Stuart's Mem. in Supp. of Summ. J. at 5, Docket No. 80; Dr. Loes's Mem. in Supp. of Summ. J. at 11-12, Docket No. 95; Dec. 5, 2013 Ord. Op. at 2 n.2, Docket No. 106.)

probation violation.[2]  (Am. Compl.at 4; Sheriff Stuart's Mem. in Supp. of Summ. J. at 1.)

As part of the intake process, Nelson reported that he suffers from migraine headaches[3]

and has a bad hip.  (Sheriff Stuart's Ex. D, Docket No. 82-1.)  On November 15 and 16,

Nelson's second and third days at Anoka County Jail, he sent two inmate request forms,

also known as "kites,"[4] concerning his hip pain and migraines.  (Ex. L to Decl. of Bryon

G.  Ascheman,  Docket  No.  97-1.)    On  November  15,  Nelson  complained  of

"[e]xcruciating hip pain, hip way past need for replacement."  (Id.)  Nelson stated that he

"[w]as on pain meds" and "[n]eed[ed] Im[i]trex or [he] get[s] chronic migraines."  (Id.)

A  staff  member  responded  the  same  day,  stating  Nelson's  concerns  were  "[a]lready

[a]ddressed."  (Id.)  On November 16, Nelson wrote: "I need meds.  I have a migraine

headache and have had it all night.  It's inhumane not to give me my prescribed meds.

It's also torture, you cannot imagine what I'm going through.  Not be able to get my

meds is what put me here!"  (Id.)  Nelson received a response the same day indicating

that he would "be seen in medical."  (Id.)

---

[2] Sheriff Stuart and Dr. Loes both reference Nelson's prior criminal history in their supporting memoranda.  (See, e.g., Sheriff Stuart's Mem. in Supp. of Summ. J. at 1; Dr. Loes's Mem. in Supp. of Summ. J. at 2-3.)  Nelson requests that the Court "strike all the deflaming [sic] subject matter" from these memoranda, stating that the reason for his being in the Anoka County Jail "is completely irrelevant to this complaint." (Nelson's Resp. at 2.)  The Court agrees that the reason for Nelson's detention is irrelevant to the claims at hand.  Because this information is irrelevant to Nelson's claims, the Court has not included it in its Report and Recommendation.  Nevertheless, because this information is part of the factual history, the Court will not strike it from the briefs of Sheriff Stuart and Dr. Loes.

[3] The record reflects that Nelson has a history of head trauma.  A clinic note from 2001 describes Nelson's history as follows:

> He has had a lot of trauma in the past where he was hit in the head with an ax[e].  He has been hit on the head with cue sticks from billiards.  He once drove off a bridge into some shallow water and hit his head.  He has also had motor vehicle accidents where he has turned over and landed on his head.

(Sheriff Stuart's Ex. AA.)

[4] While incarcerated at Anoka County Jail, Nelson asserts that he submitted "over 300 kites and grievances" concerning his migraines and hip pain.  (Am. Compl. at 9; Nelson's Resp. to Summ. J. at 5, Docket No. 105.)  The record contains only a small fraction, of kites concerning the matters at issue in this litigation.

Initially, Nelson was treated at the Anoka County Jail by another physician, R. Alper, M.D., who is not a party to this lawsuit. (Dr. Loes's Mem. in Supp. of Summ. J. at 3; Ex. A to Ascheman Decl.) Dr. Alper saw Nelson on November 16 to address his headache complaints. (Ex. M to Ascheman Decl.) Nelson reported that he "is supposed to be on Concerta, Imitrex, and Tramadol," but has not been taking his medication for "a while" due to the lack of insurance. (*Id.*) Nelson also told Dr. Alper that acetaminophen and ibuprofen do "not work well for him." (*Id.*) Dr. Alper prescribed ibuprofen for the time being and directed staff to contact Nelson's pharmacy and get a complete list of Nelson's medications. (*Id.*) A follow-up evaluation appointment was to occur after the list was received. (*Id.*) Two days later, the Concerta and Tramadol[5] prescriptions were confirmed and the medication provided to Nelson. (*Id.*)

In late November 2010, Dr. Alper prescribed Imitrex[6] for Nelson's migraines. (Ex. A to Ascheman Decl.) In December 2010, Nelson's records indicate that he was experiencing pain in his left hip. (*Id.*; *see also id.* at Ex. C.)

Nelson was first seen by Dr. Loes on January 10, 2011, with complaints of left hip pain. (*Id.* at Ex. C.) Dr. Loes saw Nelson again on January 20. (*Id.* at Ex. O.) Nelson reported "multiple episodes of ongoing pain." (*Id.*) Dr. Loes noted that Nelson's Tramadol prescription expired the day before and Nelson was currently sleeping in the "top tier." (*Id.*) Dr. Loes noted the need to evaluate Nelson's pain medications and did

---

[5] "Tramadol is used to relieve moderate to moderately severe pain, including pain after surgery. The extended-release or long-acting tablets are used for chronic ongoing pain." *Tramadol (By mouth)*, PubMed Health, Nat'l Ctr. for Biotechnology Info., https://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0012486/ (last visited Jan. 27, 2014).

[6] Imitrex is a brand name for sumatriptan and "is used to treat acute migraine headaches in adults. It is not used to prevent migraine headaches . . . ." *Sumatriptan (Imitrex)*, PubMed Health, Nat'l Ctr. for Biotechnology Info., https://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0001727/ (last visited Jan. 27, 2014).

not renew the Tramadol prescription at the time, but prescribed acetaminophen and ibuprofen on an "as needed" basis.  (*Id.*)  Dr. Loes also moved Nelson to the "lower tier." (*Id.*)   At the end of January, staff reported to Dr. Loes that Nelson was still moving slowly and limping and Dr. Loes renewed Nelson's Tramadol prescription.  (*Id.*; *see also id.* at Ex. E.)

Dr. Loes renewed Nelson's Imitrex prescription on February 3.  (*Id.* at Ex. B.)

On February 11, Nelson was seen by Cyril F. Kruse, III, M.D.,[7] with Orthopaedic Partners, P.A., for complaints of left hip pain.  (Nelson Ex. P, Docket No. 99-1.)[8]  Nelson reported that he experiences pain on a daily basis, which interferes with his activities of daily living.  (*Id.*)   Nelson also reported that he previously had his right hip replaced. (*Id.*)  Upon examination, Dr. Kruse noted that Nelson had no tenderness in his pelvis, but "does have some pain with internal rotation of the left hip and limited motion."  (*Id.*)  An x-ray was taken, which showed "extreme collapse and advancing avascular necrosis of the left hip with osteoarthritis."  (*Id.*)   Dr. Kruse's notes indicate that he "discussed

---

[7] Dr. Kruse is not a party to this litigation.

[8] Dr. Loes objects to Nelson's exhibits because they were not submitted pursuant to an affidavit and many of them contain "added handwritten commentary on them," making it " impossible to determine what is original and what has been subsequently added."  (Dr. Loes's Reply at 1 n.1, Docket No. 103.)  Nelson asserts that "[a]ny notations on [the exhibits] it is 'very obvious to see' are just notations 'that make it much easier to understand' how and what violations they pertain to and do not affect the quality of the evidence at all!"  (Nelson's Surreply at 2.)  Because many of Nelson's exhibits involve documents that were handwritten in the first instance, it is often difficult to separate out the "original" handwriting from the added notations.  "To be considered on summary judgment, documents must be authenticated by and attached to an affidavit made on personal knowledge setting forth such facts as would be admissible in evidence."  *Shanklin v. Fitzgerald*, 397 F.3d 596, 602 (8th Cir. 2005) (quotation omitted).  Because Nelson's exhibits are not presented in the proper form, they need not be considered.  *See id.*  ("In light of the lack of affidavits supporting Shanklin's submissions, we conclude the district court neither abused its discretion nor committed any error of law by striking Shanklin's unauthenticated and inadmissible exhibits.").  Nevertheless, the Eighth Circuit has stated that "the standard is not whether the evidence at the summary judgment stage would be admissible at trial—it is whether it *could* be presented at trial in an admissible form." *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 793 (8th Cir. 2012).  Dr. Loes does not contend that the exhibits could not be presented in an admissible form at trial.  Therefore, the Court will consider Nelson's exhibits to the extent the Court is able to distinguish between the "original" exhibit and the added notations.  *See id.* (court did not abuse its discretion in considering evidence for purposes of summary judgment where defendant "d[id] not even attempt to argue that the information . . . could not have been presented in an admissible form at trial").

options" with Nelson and Nelson "want[ed] to proceed with total hip arthroplasty."  (*Id.*)

Dr. Kruse noted that he was "not sure [Nelson] will follow up based on his insurance"

and stated "[w]e can always get him in for an intraarticular injection in the meantime."

(*Id.*)  Nelson received the injection on February 23.  (Ex. 3 to Aff. of Diane Haugen,

Docket No. 101-1.)

In late February, Nelson sent a kite, asking for a cane to take some of the weight

off of his hip and ease the pain.  (Nelson Ex. L.)  On March 1, Nelson was told that canes

were not provided "due to security reasons."  (*Id.*)

On March 3, Nelson was seen for complaints of left knee pain.  (Ex. P to

Ascheman Decl.)  Dr. Loes's notes indicate that he gave Nelson exercises and

recommended ice.  (*Id.*)  Nelson was also instructed to follow up if the pain did not

improve.  (*Id.*)  Dr. Loes also noted the possibility of a steroid injection.  (*Id.*)

Dr. Loes renewed Nelson's Imitrex prescription on March 5.  (*Id.* at Ex. E.)

On March 9, Nelson stated in a kite that his "pain has gone (in my hip mostly this

AM) to another level" and he would "be lucky" to make it to a court appearance the

following day.  (*Id.* at Ex. Q.)  Nelson asked that the "the doctor" be informed.  (*Id.*)  On

March 11, an unidentified staff member responded that Nelson's concerns were

"addressed."  (*Id.*)  Dr. Loes prescribed Vicodin for Nelson on March 18.  (*Id.* at Ex. E.)

A progress note from March 30 notes that Nelson was being seen for a "1st visit

for case management of chronic hip, knee, and back pain."  (Sheriff Stuart's Ex. Y.)  Dr.

Loes increased Nelson's Vicodin prescription.  (*Id.*)  Nelson was also given an extra

blanket to use between and under his knees." (*Id.*)  In addition, on March 31, Nelson was authorized to try using a cane.  (*Id.*; Nelson Ex. M.)

On April 5, Dr. Loes again renewed Nelson's Imitrex prescription.  (Ex. D to Ascheman Decl.)

On April 8, Nelson was seen for a follow-up appointment concerning his hip pain. (Sheriff Stuart's Ex. Y.)  Notes from the appointment indicate that Nelson had been using his cane incorrectly.   Nelson was also proscribed Celebrex to help with pain management.  (*Id.*)

On April 11, Nelson submitted a grievance, stating that

> [t]he pain medicine strength is always 2 steps behind the severity of the pain and medical condition.  'Good' pain-management is extremely necessary but does not take the place of the obvious cure or answer.  It is absolutely negligent to not do the operation that months ago Dr. Kru[s]e said needed ASAP.

(Nelson Ex. E.)   A staff member responded the same day, asking Nelson if he had "spoken to [his] attorney about asking the judge for a medical furlough" as "[w]e have tried on our side but cannot due to probation violation."  (*Id.*)

On April 17, Nelson submitted another grievance:

> Once again, I've had to endure more unnecessary pain today, this morning, because I did not get my morning pain meds till after 9:20 am!  That means from 8:00 PM last night till after 9:20 AM I had no pain medication for an extremely agonizing, terribly painful, untreated medical condition! That's over 13 hrs and 20 minutes.

(Nelson Ex. A.)  There is no response to this grievance in the record.  (*Id.*)

The next day, Nelson submitted a similar grievance:

> Meds once again did not get to unit till around 8:45 this
> morning. It's getting better than it has been for time. Since I
> last got pain meds at 8:00 last nite [sic] that's 12 hrs and 45
> minutes with no pain meds instead of 13, 13 hr 4 min, 13 hrs
> 20 min, 14 hrs and 17 hrs it has been before!

(Nelson Ex. Q.)  A staff member responded the following day, stating there had only

been one nurse available to pass out medication.  (*Id.*)

The record also contains two progress notes from April 18.  The first states that

staff had talked with the public defender's office regarding Nelson's medical issues and

treatment plan.  (Sheriff Stuart's Ex. Y.)  The second is from Dr. Loes, noting that Nelson

is "in intractable pain unrelieved w[ith] conservative therapies.  Harm in postponing

surgery is . . . continued pain and limited function."  (Ex. 3 to Haugen Aff.)  Staff

contacted Dr. Kruse's office on April 20 to schedule Nelson for hip replacement surgery.

(*Id.*)  The surgery was scheduled for May 24.  (*Id.*)

On April 25, Dr. Loes noted that Nelson had been taking Imitrex "regularly" for

undocumented headaches, decreased Nelson's prescription, and indicated a "chart

review" would occur the following week if Nelson did not schedule a medical

appointment.  (Ex. F to Ascheman Decl.)  Nelson responded to the changed prescription

by grievance on April 29:

> The doctor here has changed my Im[i]trex migraine med from
> 3 or more a week to 2 a week!  I'm sure it's a matter of cost
> and lack of compassion versus me being in total agonizing,
> debilitating pain!  And even worse than those words describe
> it has to be that because I get 18 per month on the outside
> with absolutely no side effects.

(*Id.* at Ex. H.)   The following day, a staff member responded that Nelson's grievance was "noted."   (*Id.*)   Nelson's Imitrex prescription was discontinued on May 2 and Dr. Loes instructed the nursing staff to document Nelson's headache history.   (Ex. F to Ascheman Decl.)

On May 10, an officer conducted a "shakedown" of Nelson's cell.   (Sheriff Stuart's Ex. U.)   Among other things, the officer "found a small white pill.   It appeared to be broken in half, and partially dissolved.   It was wrapped in a piece of paper."   (*Id.*)   Nelson told the officer that he did not know anything about the pill.   (*Id.*)   The pill was subsequently identified as Vicodin, which Nelson had a prescription for at the time.   (*Id.*)   Nelson was cited with a rule violation for accumulating medication.   (*Id.*)   Nelson's Vicodin prescription was discontinued.   (*See* Decl. of John Loes, M.D. ¶ 27, Docket No. 96; Sheriff Stuart's Ex. Z.)

On May 12, Nelson submitted the following kite:

> Doctor, I'm sorry to have to let you know that you do not know more than all the doctors, specialists, Gastroenterologists, Neurologists, and more that have been keeping an eye on me and my liver for the over 30 years that I now am sure I have been taking Im[i]trex!   The sumatriptan that can damage the liver has Naproxin [sic] Sodium in it!   [T]he Reason you don't want to give me Im[i]trex is the cost!   Why don't we try "Relpac"[?]

(Nelson Ex. J.)   The next day, a staff member responded that "[t]he doctor doesn't answer kites," but stated a copy would be forwarded to him.   (*Id.*)

Nelson submitted another kite concerning the discontinuation of Imitrex the following day:

> The over 30 years that I've been taking Im[i]trex (sumatriptan) has not been shown to have done any significant damage to my liver, not any at all actually! The only that might is the sumatriptan mixed with "Naproxen," which I don't take! Besides what good is my liver if I suffer excruciatingly daily from being denied Im[i]trex which causes these chronic debilitating migraines? I've been suffering almost daily since.

(Nelson Ex. K.)  On May 16, a staff member responded that these concerns were "[p]reviously addressed." (*Id.*)

Three days later, on May 19, Dr. Loes noted that Nelson was experiencing "excruciating headaches" and started Nelson on Imitrex again. (Ex. I to Ascheman Decl.)

On May 24, Nelson was furloughed for a left total hip arthroplasty. (Dr. Loes's Decl. ¶ 28.) Following his surgery, Nelson returned to the Anoka County Jail. While the day of his return is not clear from the record, it appears to be no later than May 28, at which point Anoka County Jail medical staff was providing Nelson with aftercare treatment. (Aff. of Diane Haugen in Supp. of Defs.' Reply ¶ 7, Docket No. 101.)

On May 29, it was noted that Nelson also had a prescription for "Lovonex"[9] following his surgery, which had not been received by the medical unit. (Ex. 1 to Supp. Decl. of Bryon G. Ascheman, Docket No. 104-1.) It appears that Nelson was given this prescription personally when furloughed for surgery and it was not forwarded to the medical unit at the Anoka County Jail. (*Id.*)

---

[9] It appears that this may be a typographical error in the progress notes as Lovenox is a brand-name for enoxaparin, which is injected, and is used to "prevent[] and treat[] blood clots." *Enoxaparin (Injection) (Lovenox)*, PubMed Health, Nat'l Ctr. For Biotechnology Info., https://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0010108/ (last visited Feb. 13, 2014). *See infra* n.16.

On May 29, Nelson also began a series of heparin injections.  (*Id.*; *see also* Sheriff Stuart's Ex. Y.)  Nelson received these injections on May 30, May 31, June 1, and June 2. (Sheriff Stuart's Ex. Y.)  During this time, staff also noted that there were no signs of infection at the site of Nelson's hip surgery.  (*Id.*)  On the morning of June 3, Nelson refused to come to the medical unit to have his dressing changed and receive a heparin injection.  (Ex. U to Ascheman Decl.)  Nelson stated his "headache is too bad."  (*Id.*) Nelson did receive an injection later that day.  (*Id.*)  Nelson received two additional injections on June 4 and Dr. Loes also discontinued Nelson's Vicodin prescription, stating he would consider resuming it if Nelson was in obvious discomfort or reported decreased sleep due to pain.  (*Id.*)

Nelson also submitted a grievance on June 3, stating that he had been refused medication:

> Friday morning of the 3rd, I was refused, by nurse Chris in front of Officer Cate[remainder of name illegible], my pain meds and antibiotics etc. for my hip replacement and the med for my thyroid.  I asked are you going to give me my meds" and she said "No!"  I was suffering severely from a migraine I had had throughout the whole previous night and on and off for several days prior, more on th[a]n off!  The reason I'm suffering so terribly from migraines still is that Dr. Loes still refuses to treat me with the . . . . [cuts off].

(Nelson Ex. B.)  A staff member responded on June 10, stating that Nelson "need[ed] to discuss [his] prescriptions and doses with Dr. Loes" and that Nelson "must take [his] meds at med pass just like everybody else."  (*Id.*)

In the meantime, Nelson was seen by Dr. Loes on June 8.  Nelson reported that his migraines "are excruciating" and make him nauseous.  (Sheriff Stuart's Ex. X.)  Nelson

told Dr. Loes that prophylactic medications had not worked in the past and only Imitrex worked on his migraines.  (*Id.*)  Dr. Loes started Nelson on propranolol.[10]  (*Id.*)  Dr. Loes also noted that Nelson was not complying with his activity restrictions following his hip surgery.  (*Id.*)  On June 10, Nelson refused to take the propranolol.  (Ex. V to Ascheman Decl.)

The record contains an informational report from an officer on June 19.  Nelson approached the reporting officer and "asked if nursing staff had left for the night," stating "he was in a lot of pain from his hip surgery."  (Sheriff Stuart's Ex. U.)  The officer contacted medical staff and a nurse stated that Nelson should submit a kite with his complaints and he would be seen the following day.  (*Id.*)  Nelson "then began [to] tell[ the officer] that he has had this pain for the last five days, and is worried about an infection."  (*Id.*)  Nelson stated "he would just have to go to the hospital."  (*Id.*)  The officer relayed these concerns to the nurse, who again stated that Nelson should put his complaints in writing and "he would be seen in the morning."  (*Id.*)  Nelson ultimately submitted a kite with his complaints.  The reporting officer noted that Nelson's complaints were inconsistent with the officer's own observations over the past few days. (*Id.*)

Although largely illegible, a progress note shows that Dr. Loes saw Nelson on June 21.  (Sheriff Stuart's Ex. W.)  Nelson complained of frequent headaches and neck pain from migraines.  (*Id.*)  Dr. Loes noted that "staff reports [Nelson] sometimes stays in

---

[10] Propranolol treats migraine headaches among other conditions.  *Propranolol (By mouth)*, PubMed Health, Nat'l Ctr. for Biotechnology Info., https://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0011873/?report=details (last visited Jan. 28, 2014).

his room" with headaches and Nelson is refusing to take the propranolol because he tried it before and it did not work. (*Id.*) Noting that Nelson was refusing "prophylactic t[reatment] but has not overused Imitrex in the past," Dr. Loes prescribed Imitrex to Nelson again. (*Id.*) During this visit, Dr. Loes also noted that Nelson's left hip replacement was doing well. (*Id.*)

On July 16, Nelson submitted another grievance regarding his migraines. (Nelson Ex. F.) Nelson wrote that he is "being totally denied treatment for the majority of [his] migraine headaches! The torture is indescribably terrible! They might as be [sic] torturing me like in a war concentration camp for information only that would be less pain." (*Id.*) The same day, a staff member responded that Nelson should have "the deputies log every time [he is] in bed with a migrain[e], and [the staff member] will inform the Doctor." (*Id.*)

On July 23, Nelson submitted the following kite:

> I've had another migraine late last night and all through the morning, being tortured terribly because of being denied treatment! And yes I am being denied treatment because I am being denied Im[i]trex, the only thing proven to work [illegible] which I've experienced no side [e]ffects through the many, many, many years of seeing specialists and trying <u>everything</u> else and often experiencing bad side [e]ffects yet no relief from all that was tried. Will not take the drugs proven harmful to me that Dr. Loes expects me to take.

(Sheriff Stuart's Ex. G.) The same day, a staff member responded: "The detention staff are logging your reports of pain. This is information medical can access for documentation of your pain. Please be respectful in your kites. <u>noted</u> [sic]." (*Id.*)

On July 28, Nelson submitted another kite:

> I don't know which jailors logged anything or what exactly they logged, but I have a right to documentation myself. I had a torturous unbearable migraine headache from Friday night 7-22-11 until Tuesday evening 7-26-11 which could have been prevented if not denied the Im[i]trex. There is no excuse for any human being to let either another human being or even an animal suffer like that when it could simply and easily have been prevented. I also could not even eat or drink anything most of the time. It is a pure case of one man premeditatively [sic] torturing another!

(*Id.*) A staff member responded the following day, saying Nelson's request was "Noted." (*Id.*)

## III.

Summary judgment is appropriate where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The movant has the burden of demonstrating that no genuine issue of material fact remains to be decided. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When a motion for summary judgment has been made and supported by the pleadings and affidavits, the burden shifts to the party opposing the motion to demonstrate that a disputed issue of material fact remains. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." *Amini v. City of Minneapolis*, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252 (1986)). "A plaintiff may not merely point to unsupported self-serving allegations, but must substantiate allegations with sufficient probative evidence that would permit a

finding in the plaintiff's favor." *Davidson & Assocs. v. Jung*, 422 F.3d 630, 638 (8th Cir. 2005).

"To state a claim under 42 U.S.C. § 1983, a plaintiff must show that he was deprived of a right secured by the Constitution and the laws of the United States and that the deprivation was committed by a person acting under the color of state law." *Alexander v. Hedback*, 718 F.3d 762, 765 (8th Cir. 2013); *see also* 42 U.S.C. § 1983. "The Eighth Amendment obligates state prison officials to provide inmates with medical care." *Laughlin v. Schriro*, 430 F.3d 927, 928 (8th Cir. 2005) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)); *see also Jones v. Minn. Dep't of Corrections*, 512 F.3d 478, 481 (8th Cir. 2008) ("It is well established that the Eighth Amendment prohibition on cruel and unusual punishment extends to protect prisoners from deliberate indifference to serious medical needs." (quotation omitted)).  At the relevant time, however, Nelson was not a prisoner convicted of a crime, but a pretrial detainee.

While "[t]he Eighth Amendment does not apply to pretrial detainees, . . . the Due Process Clause of the Fourteenth Amendment imposes analogous duties on jailers to care for detainees." *Christian v. Wagner*, 623 F.3d 608, 613 (8th Cir. 2010) (quotations omitted); *see also Luckert v. Dodge Cnty.*, 684 F.3d 808, 817 (8th Cir. 2011) (stating the Fourteenth Amendment provides protection to pretrial detainees "at least as great" as that afforded to prisoners under the Eighth Amendment); *McRaven v. Sanders*, 577 F.3d 974, 979-80 (8th Cir. 2009) (stating little practical difference between deliberate-indifference-to-medical-needs claims brought by pretrial detainees and prisoners as "[p]retrial detainees are entitled to the

same protection under the Fourteenth Amendment as imprisoned convicts receive under the Eight Amendment" (quotation omitted)).

> A pretrial detainee alleging unconstitutional conditions of confinement based on denial of medical care must establish both that the deprivation of which he complains was sufficiently serious as an objective matter to deny him the minimal civilized measure of life's necessities and that the prison officials acted with a sufficiently culpable state of mind.

*Christian*, 623 F.3d at 613.  Accordingly, the pretrial detainee must establish both an objective and a subjective component.  *Thompson v. King*, 730 F.3d 742, 746 (8th Cir. 2013).  The pretrial detainee "must show that he suffered from a medical need that was objectively 'serious[,]' . . . [which] requires evidence that the medical condition was diagnosed by a physician as requiring treatment, or was so obvious that a lay person would recognize the need for a physician's attention."   *Christian*, 623 F.3d at 613 (citation omitted).   "The subjective component requires a p[retrial detainee] to show that the defendant actually knew of, but deliberately disregarded such need."  *Thompson*, 730 F.3d at 746 (quotation omitted).

> In order to demonstrate that a defendant actually knew of, but deliberately disregard, a serious medical need, the plaintiff must establish a mental state akin to criminal recklessness: disregarding a known risk to the inmate's health.  This onerous standard requires a showing more than negligence, more even than gross negligence, but less than purposefully causing or knowingly bringing about a substantial risk of serious harm to the inmate.

*Id.* at 746-47 (quotations and citations omitted).   "Whether a prison's medical staff deliberately disregarded the needs of an inmate is a factually-intensive inquiry."  *Meuir v. Greene Cnty. Jail Employees*, 487 F.3d 1115, 1118 (8th Cir. 2007).

## A.  Dr. Loes

Dr. Loes's arguments are directed at the subjective component, i.e., whether he knew of but deliberately disregarded Nelson's medical needs.  Thus, for purposes of Dr. Loes's motion for summary judgment, the Court assumes both Nelson's migraines and hip pain were serious medical needs.  Dr. Loes argues that he did not deliberately disregard Nelson's medical needs; rather, Nelson simply disagreed with Dr. Loes's recommend course of treatment.

### 1.  Migraines & Imitrex

Dr. Loes asserts that he did not act with deliberate indifference to Nelson's migraines because he did in fact prescribe Imitrex to Nelson and "was actively engaged in attempting to evaluate these headaches and determine the most appropriate course of treatment."  (Dr. Loes's Mem. in Supp. of Summ. J. at 16, 17.)  Dr. Loes acknowledges that Nelson's Imitrex prescription was discontinued on two occasions, but contends both times were part of an ongoing effort to provide Nelson with appropriate treatment.  (*Id.* at 17.)

Nelson responds[11] that Dr. Loes has demonstrated deliberate indifference because

---

[11] Nelson filed both a responsive memorandum and a surreply (a response to a reply memoranda) to the summary judgment motions.  Because Nelson is proceeding pro se, the Court has liberally construed his responsive documents.  *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) ("A document filed pro se is 'to be liberally construed' . . . ." (quoting *Estelle*, 429 U.S. at 106); *Stone v. Harry*, 364 F.3d 912, 914 (8th Cir. 2004) ("When we say that a pro se complaint should be given liberal construction, we mean that if the essence of an allegation is discernible, even though it is not pleaded with legal nicety, then the district court should construe the complaint in a way that permits the layperson's claim to be considered within the proper legal framework.").  While surreplies are typically not permitted in conjunction with dispositive motions and Nelson did not seek permission to file the extra brief, the Court will construe both Nelson's response and surreply as a single response to the motions before the Court.  *See* D. Minn. LR 7.1(c) (listing moving party's memorandum, responding party's memorandum, and moving party's reply memorandum in connection with dispositive motion practice);(i) ("Except with the court's prior permission, a party must not file a memorandum of law except as expressly allowed under LR 7.1."); *Tyler v. Salazar*, No. 10-cv-1161 (JNE/LIB), 2012 WL 3113866, at *8 (D. Minn. June 27, 2012) ("Pro se Plaintiffs are

> "Dr. Loes insisted that [Nelson] take a medicine Dr. Loes *knew didn't work*," because [Nelson] had plainly told him that he had previously tried it and it hadn't worked *at all, and [Nelson would be risking serious side effects "without any possible benefits at all"*, and that Dr. Loes would not give [Nelson] the medicine he emphatically and unquestionably told Dr. Loes it was the only medicine "proven" to work after trying everything made for migraine headaches while under the care of neurologists and specialists *who are "extremely" more experienced in the field, without question, th[a]n Dr. Loes!*

(Nelson's Surreply at 8.)   Nelson asserts that he "kept informing D[r.] Loes of all the 'many' other medicines he had tried through the many years of seeing specialists." Nelson's Resp. at 3.)   Nelson argues

> it should have been enough for [him] to tell Dr. Loes, which he plainly did, that [p]ropranol[ol] "did not work at all" when he tried it before, and not keep trying to force it on [him], and to not, without any good reason, give [him] "his specialist prescribed non-narcotic, non-addictive medication Im[i]trex" that was absolutely proven to work, and work well, to both prevent *"and"* to cure full-fledged migraine headaches!

(Nelson's Surreply at 3.)

Nelson "must clear a substantial evidentiary threshold to show that the prison's medical staff deliberately disregarded [his] needs by administering inadequate treatment." *Meuir*, 487 F.3d at 1118.   A claim for inadequate medical treatment must be more than disagreement over a course of medical treatment. *Id.* at 1118-19; *see also Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010).

Nelson claims that Dr. Loes was deliberately indifferent to his medical needs by refusing to prescribe Imitrex.  Putting aside for a moment the fact that the record reflects

---

regularly granted significant leeway in this court which is designed to compensate pro se litigants' lack of legal expertise.").

Nelson was prescribed Imitrex for the majority of the time in question, the only evidence Nelson has produced in support of his claim that Dr. Loes's treatment of Nelson's migraines was constitutionally inadequate are excerpts of three online news articles.[12] (Migraine Articles, Docket No. 99-2.)  Collectively, these articles discuss the potential for permanent brain damage resulting from migraines; the importance of preventing migraines; and the use of Imitrex in treating migraines.  (*Id.* at 1-5.)  Critically, however, Nelson has not produced any medical evidence that he suffered brain damage while under Dr. Loes's care.  *See Gibson v. Weber*, 433 F.3d 642, 646 (8th Cir. 2006) ("To avoid summary judgment an inmate alleging that a delay in treatment constitutes a constitutional deprivation must produce medical evidence to establish that the delay had a detrimental effect."); *see also Meuir*, 487 F.3d at 1119 (affirming summary judgment

---

[12] In response to the motions of Dr. Loes and Sheriff Stuart, Nelson repeatedly makes reference to having a large amount of evidence supporting his claims that has not been submitted to the Court.  (*See, e.g.*, Nelson's Response at 1 ("there will be much, much more proof of the very factual allegations in Plaintiff's complaint"); 2 ("Plaintiff is enclosing only just a few of the many, many, many documents of proof in writing as to the great many instances of Deliberate Indifference on the part of all the Defendants . . . ."); Nelson's Surreply at 3 ("even without the huge amount of evidence he still has but has been unable to copy and send"), 12 ("even without the 'huge' amount of evidence and citations still not submitted to the court"), 14 ("and has much more evidence not yet submitted"), 16 ("a 'great amount of proof'").  "Evidence, not contentions, avoids summary judgment." *Larry v. Potter*, 424 F.3d 849, 851 (8th Cir. 2005) (quotation omitted).

> A plaintiff may not merely point to unsupported self-serving allegations, but must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor.  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."

*Davidson*, 422 F.3d at 638 (8th Cir. 2005) (citation omitted) (quoting *Anderson*, 477 U.S. at 252); *see also Bayside Holdings, Ltd. v. Viracon, Inc.*, 709 F.3d 1225, 1228 (8th Cir. 2013).  Notwithstanding his pro se status, Nelson is "required to respond to defendants' motions with specific factual support for his claims to avoid summary judgment." *Beck v. Skon*, 253 F.3d 330, 333 (8th Cir. 2001) (pro se litigants required to respond to motion for summary judgment "[l]ike any other civil litigant . . . .").  Further, as this Court previously told Nelson, the fact that he is proceeding in forma pauperis ("IFP"), likewise does not relieve him "from all the expenses of litigation. *See Porter v. Dep't of Treasury*, 564 F.3d 176, 180 n.3 (3d Cir. 2009) ('We note that the granting of IFP status exempts litigants from filing fees only. It does not exempt litigants from the costs of copying and filing documents; service of documents other than the complaint; costs; expert witness fees; or sanctions.' (citations omitted))."  (Jan. 14, 2013 Ord. at 1-2, Docket No. 43.)

where prisoner produced "neither expert testimony nor documentary evidence' to support claim of inadequate treatment). Assuming for purposes of this motion that migraines *may* cause brain damage, as stated in Nelson's articles, there is no medical evidence indicating that such damage occurred in Nelson's case.[13]

Further, Dr. Loes submitted an affidavit setting forth the medical basis for his treatment of Nelson's migraines. In his affidavit, Dr. Loes recognizes that Imitrex is used to treat migraines and "should be taken upon the onset of migraine headache symptoms." (Dr. Loes Decl. ¶ 7.) *After renewing Nelson's Imitrex prescription twice*, Dr. Loes states that he adjusted the prescription because it appeared "Nelson was taking Imitrex even though a clear history of migraine headaches was not established." (*Id.* ¶ 9; *see also id.* ¶ 8.) For a period of approximately two weeks, Dr. Loes discontinued Imitrex due to the lack of documentation concerning Nelson's migraines and requested that jail staff document Nelson's complaints of migraine pain. (*Id.* ¶ 10.) Dr. Loes notes that, during this time, Nelson was on additional pain medication related to his hip which "should have been sufficient to cover any pain associated with a headache." (*Id.*)

When Nelson complained of "an excruciating headache," *Dr. Loes again prescribed Imitrex* but in a smaller dose based on clinical trials regarding Imitrex's effectiveness at various levels.[14] (*Id.* ¶¶ 11, 12.) Two weeks later, when Nelson reported

---

[13] Moreover, Nelson's history of head trauma, *see supra* n.3, further highlights the need for medical evidence establishing that it was the manner in which Dr. Loes treated Nelson's migraine headaches that had a detrimental effect on Nelson. *See Gibson*, 433 F.3d at 646 (given variety of factors that could have contributed to inmate's condition, medical evidence was needed to determine whether delays in treatment or other factors resulted in need for amputation).

[14] Dr. Loes was also concerned about Nelson's liver function due to a previous Hepatitis C diagnosis. (Dr. Loes Decl. ¶ 13.) Imitrex can affect the patient's liver and an "[i]ndividual with existing liver disease may not metabolize the drug properly." (*Id.* ¶ 13; *see also id.* ¶ 7.)

that the dose was not effective, Dr. Loes prescribed propranolol instead.  (*Id.* ¶ 14.)  Dr. Loes states that this decision was based on (1) Nelson's own descriptions of his headache pain, suggesting the headaches might not be migraines; (2) propranolol's ability to prevent migraines from occurring; and (3) the manner in which medication is distributed at the Anoka County Jail, i.e., the "Propranolol prophylaxis was indicated to maximize the response to the treatment plan in the event that Mr. Nelson did not have immediate access to Imitrex."  (*Id.* ¶ 16; *see also id.* ¶¶ 14, 15.)  And when Nelson refused to take the propranolol, *Dr. Loes again prescribed limited Imitrex* in addition to the propranolol "in an effort to treat migraines if they occurred, but to also encourage his use of the Propranolol that could prevent their occurrence."  (*Id.* ¶ 19.)  Thus, Dr. Loes's course of treatment was attempting to achieve the very goal identified in Nelson's articles—prevent Nelson's migraines from occurring.

The record reflects that Dr. Loes provided Nelson with Imitrex and ongoing treatment for his migraine pain, treatment which included trying to evaluate Nelson's need for Imitrex, documenting Nelson's migraines, and providing alternative medication designed to prevent Nelson's migraines—thereby providing more effective relief in an environment where Nelson might not have access to Imitrex right away.  "In the face of medical records indicating that treatment was provided and physician affidavits indicating that the care provided was adequate, an inmate cannot create a question of fact merely by stating that []he did not feel []he received adequate treatment."  *Meuir*, 487 F.3d at 1119 (quotation omitted).

Lastly, Nelson argues that he told Dr. Loes that he had previously tried other medications, "trying everything made for migraine headaches," and only Imitrex was effective. (Nelson's Surreply at 8.) Nelson states that he "kept informing [Dr.] Loes of all the 'many' other medicines he had tried." (Nelson's Resp. at 3.) Nelson has not identified any of these medications specifically, nor has he submitted any medical evidence of prior treatment protocols. But even if Nelson had shown certain medications were ineffective in the past, Dr. Loes was free to exercise his professional judgment and Nelson is not entitled to a particular course of medical treatment. *Dulany v. Carnahan*, 132 F.3d 1234, 1240 (8th Cir. 1997). The record is also devoid of any evidence suggesting this course of treatment "so deviated from professional standards that it amounted to deliberate indifference." *Id.* at 1243 (quotation omitted).

Because there is no genuine issue of material fact that Dr. Loes was not deliberately indifferent to Nelson's medical needs associated with his migraine headaches, the Court recommends that Dr. Loes be granted summary judgment with respect to his treatment of Nelson's migraine headaches. *See Jolly v. Knudsen*, 205 F.3d 1094, 1097 (8th Cir. 2000) (no deliberate indifference to medical needs where record showed prison doctor's decision to change dosage level of previously prescribed medication was "aimed at correcting perceived difficulties in [inmate's] dosage levels" and doctor followed up with inmate on numerous occasions, attempted other corrective actions, and referred inmate to specialist); *Steele v. Weber*, 278 Fed. App'x 699, 700 (8th Cir. 2008) (no deliberate indifference to medical needs where prison doctors adjusted dosage level of previously prescribed medication when doctors "believed [inmate's] pre-

23

incarceration levels of medication were harmful to him based on his medical history and needs, . . . performed numerous tests to determine the proper treatment, and . . . continuously tried different methods and medications to treat [inmate's] pain.").

### 2.  Hip Pain

Similarly, Dr. Loes argues that he was not deliberately indifferent to Nelson's hip pain because he prescribed pain medication and actively monitored and responded to Nelson's complaints of increasing pain.  (Dr. Loes's Mem. in Supp. of Summ. J. at 19-20; Dr. Loes's Reply at 10-12.)  Dr. Loes also contends that any delay in Nelson's hip surgery did not amount to deliberate indifference because there is no evidence in the record that the surgery was urgently required.  (Dr. Loes's Reply at 9-10.)

Nelson responds that pain itself is a serious medical need and Dr. Loes demonstrated deliberate indifference to his hip pain by taking all of Nelson's pain medication away and delaying Nelson's hip surgery for approximately six months. (Nelson's Surreply at 5, 11, 22, 36, 37, 39.)  Nelson also asserts that Dr. Loes was deliberately indifferent to his hip pain by not providing adequate aftercare following Nelson's surgery.  (*See id.* at 31, 37.)

Nelson is correct that "[d]elay in the provision of treatment or in providing examinations can violate inmates' rights when the inmates' ailments are medically serious or painful in nature."  *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1055 (8th Cir. 1989).  To evidence the severity of his pain, Nelson cites to an Anoka County Jail facility log in which jail employees logged certain observations of Nelson's behavior.  (Ex. N. to Ascheman Decl.) Between January 2011 and the date of Nelson's surgery, Nelson was often observed to be

limping. (*Id.*) While other log entries indicate that Nelson walked around without difficulty and voiced no complaints of pain, (*see id.*), the Court assumes for purposes of this motion that Nelson's hip pain was a serious medical need. Nevertheless, "[a] prisoner alleging a delay in treatment must present verifying medical evidence that the prison officials ignored an acute or escalating situation or that these delays adversely affected his prognosis." *Holden v. Hirner*, 663 F.3d 336, 342 (8th Cir. 2011) (quotation omitted).

### a. Pain Medication

Nelson contends that Dr. Loes was deliberately indifferent to his hip pain by taking "'all' pain medication" away when Nelson's hip pain was at its worst. (Nelson's Surreply at 11, 22, 39.) Nelson does not clearly allege when this discontinuation occurred.

The record reflects that when Nelson first saw Dr. Loes in January, Nelson was still taking Tramadol according to Dr. Alper's prior prescription. When Nelson returned ten days later, the prescription had expired and Dr. Loes did not renew it in order to evaluate Nelson's pain medications. In the meantime, Dr. Loes prescribed ibuprofen and acetaminophen as needed. Approximately ten days later, however, staff reported that Nelson was limping and moving slow and, consequently, Dr. Loes renewed the Tramadol prescription. Dr. Loes's short discontinuation of Nelson's Tramadol prescription to evaluate Nelson's pain medication soon after he took over Nelson's care while making other pain relievers available and subsequent renewal of Nelson's Tramadol prescription once other medications were deemed insufficient does not amount to deliberate indifference to Nelson's hip pain.

After receiving an intraarticular injection in February as recommended by Dr. Kruse, Nelson returned to Dr. Loes with additional complaints of pain in March. Dr. Loes initially

prescribed ice and exercise, instructing Nelson to follow up with him if things did not improve. In mid-March, Dr. Loes prescribed Vicodin for Nelson's pain. At the end of the month, Dr. Loes increased Nelson's Vicodin prescription, gave him an extra blanket to use between and under his knees, and authorized Nelson to have a cane. When Nelson returned with complaints of pain again in early April, it was noted that he had not been using his cane properly. Nelson was instructed on how to use his cane and given a prescription for Celebrex to help manage his pain. Shortly thereafter, Dr. Loes noted that Nelson's pain and functioning were not improving with conservative treatment, and a call was placed to schedule Nelson's surgery.

On May 10, a half-dissolved Vicodin pill was discovered in Nelson's cell. Consequently, *this prescription* was discontinued pursuant to an Anoka County Jail policy until after Nelson's surgery. As a result, between the discovery of the half-dissolved pill and Nelson's surgery, Nelson was without Vicodin for approximately 14 days.

Nelson has not put forth any evidence showing that *any of his other pain relievers* were discontinued. And, as previously discussed with respect to Nelson's Imitrex prescription, Nelson is not entitled to a particular course of medical treatment. *Dulany*, 132 F.3d at 1240. In order to survive a motion for summary judgment, Nelson must do more than just assert that all of his pain medications were taken away; he must substantiate this assertion. *See* Fed. R. Civ. P. 56(c); *Davidson*, 422 F.3d at 638. The record shows that Dr. Loes prescribed multiple pain medications and was actively monitoring Nelson's hip pain. Nelson was required to "respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. [He] must do more than simply show that there

26

is some metaphysical doubt as to the material facts." *Gannon Int'l*, 684 F.3d at 792 (citations omitted).  Nelson has not substantiated his assertion that Dr. Loes took away *all* of his pain medication and the record as a whole shows that Dr. Loes was indeed responsive to Nelson's complaints of hip pain.  Therefore, the discontinuation of Nelson's Vicodin prescription for this limited period of time is not sufficient for a rational trier of fact to find that Dr. Loes was deliberately indifferent to Nelson's medical needs.  *See id.*  ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.").

### b.  Hip Surgery

Citing Dr. Kruse's February 11 treatment notes, Nelson asserts that Dr. Loes "delayed the extremely time sensitive and necessary hip replacement surgery because of cost" for "many months."  (Nelson's Resp. at 5; *see also id.* at 3; Nelson's Surreply at 11, 36-37, 39, 43.)  Nelson contends that the hip surgery was "urgently necessary." (Nelson's Resp. at 5.)  Nelson argues Dr. Loes was "responsible for many, many months of debilitating, and agonizing pain that also kept [him] from 'participating in daily activities at all' through delaying a very crucial and immediately necessary hip replacement surgery because they did not want to pay for it!"  (Nelson's Resp. at 8.)

The period of time between Dr. Kruse's examination of Nelson and Nelson's surgery is approximately three and one-half months.  Significantly, Dr. Kruse's office scheduled Nelson's surgery over one month in advance.  There is nothing to indicate that Dr. Loes had any involvement in determining the actual date of the procedure or interfered with attempts to schedule the procedure sooner and the record reflects that Dr.

27

Kruse's office was called within two days of Dr. Loes's conclusion that more conservative treatments were not effective.  The Court agrees with Dr. Loes that "Dr. Kruse's decision to schedule the surgery [one] month out is significant."  (Dr. Loes's Reply at 9 n.7.)  Therefore, any delay occasioned by Dr. Loes would have had to occur in the preceding two months.

While Nelson repeatedly contends that his hip surgery was urgently needed, there is no medical evidence in the record to support this contention.  Upon examination, Nelson's "pelvis reveal[ed] no tenderness.  [Nelson] d[id] have some pain with internal rotation of the left hip and limited motion.  [Nelson's] left leg is short compared to the right.  The right moves slowly."  (Nelson's Ex. P.)  While an x-ray "show[ed] extreme collapse and advancing necrosis of the left hip with osteoarthritis," Dr. Kruse "discussed options" with Nelson.  (*Id.*)  Dr. Kruse noted that Nelson wanted to proceed with surgery, but at no time did Dr. Kruse indicate that surgery should be scheduled immediately.  (*Id.*)  In fact, Dr. Kruse stated Nelson could be treated with intraarticular injections while an insurance issue was resolved.  Nelson provides no medical evidence other than Dr. Kruse's treatment notes to establish the allegedly emergent nature of his condition.  These notes reveal no such emergency.  The fact that Nelson may have *wanted* hip surgery sooner rather than later does not mean that Dr. Loes was deliberately indifferent to his hip pain by not moving forward with the surgery right away under these circumstances.  *See Dulany*, 132 F.3d at 1239 ("[I]nmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to

exercise their independent medical judgment."); *see also id.* (stating society does not expect inmates to have unqualified access to health care).

Turning now to the two-month period between Dr. Kruse's examination and the scheduling of Nelson's surgery, the record shows that Nelson in fact received the intraarticular injection recommended by Dr. Kruse and Dr. Loes tried numerous other remedies to help Nelson with his pain. In addition to pain medication (including narcotic pain medication), Dr. Loes prescribed ice, exercise, a cane,[15] and an extra blanket to make Nelson more comfortable. When these conservative remedies proved ineffective, Dr. Loes directed staff to schedule Nelson for surgery. While these efforts may not have been "as extensive as those a private health-care provider might have taken, [they] d[o] not reflect deliberate indifference to [Nelson's] medical needs." *Logan v. Clarke*, 119 F.3d 647, 650 (8th Cir. 1997).

Most significantly, Nelson has provided no medical evidence that Dr. Loes's course of treatment over these two months was constitutionally inadequate. *See Meuir*, 487 F.3d at 1119. "[P]rison doctor[s] remain[] free to exercise [their] independent

---

[15] As part of his deliberate-indifference claim based on treatment of his hip pain, Nelson contends that he "asked and eventually 'pleaded' with Dr. Loes to give [him] a cane to help [him] be able to walk." (Am. Compl. ¶ I.) Nelson alleges that medical personnel "lied and said they don't give out canes," yet Nelson observed "several others with not as severe a problem as [his] [to] who[m] they had given canes." (*Id.*) In his response to the motions of Dr. Loes and Sheriff Stuart, Nelson asserts that the record contains "proof that the Defendants lied when they said they don't, and refused to, authorize a cane for the Plaintiff's extremely painful hip, since they did authorize one many, many months later after the surgery when the pain was not even as extreme, and this proves deliberate indifference." (Nelson's Resp. at 6; *see also* Nelson's Surreply at 31, 37.)

The record reflects that Nelson requested a cane on February 28 and was told by staff that canes are not provided "due to security reasons." (Nelson's Ex. L.) There is nothing in the record to suggest that, at the time Nelson made his request, a cane had been previously prescribed to him by any physician. Approximately one month later, after an appointment to address "hip, knee, and back pain," (Sheriff Stuart's Ex. Y), Dr. Loes authorized Nelson to have a cane, (*id.*; *see also* Nelson's Ex. L). The record reveals that Nelson did receive a cane shortly thereafter because he was seen one week later to address continuing pain and instructed on proper use of his cane. While Nelson may have wished to have a cane provided sooner, the record shows that a cane was provided once Dr. Loes determined it was medically necessary. *See Logan*, 119 F.3d at 650.

professional judgment and an inmate is not entitled to any particular course of medical treatment." *Dulany*, 132 F.3d at 1240.  Nelson has offered no evidence that this course of treatment "so deviated from professional standards that it amounted to deliberate indifference."  *Id.* at 1243 (quotation omitted); *see also Thompson*, 730 F.3d at 747 (deliberate indifference "requires a showing more than negligence, more even than gross negligence" (quotation omitted)).  Thus, even if, as Nelson alleges, Dr. Loes's decision to first pursue these alternative measures was motivated by an effort to keep costs down, Nelson has not shown that this course of treatment deviated from any standard of care.  *See Dulany*, 132 F.3d at 1239 ("Mere negligence or medical malpractice, however, are insufficient to rise to a constitutional violation.").  The record shows that, over the course of two months, Dr. Loes monitored Nelson's pain and eventually recommended surgery when other methods were not successful.  "The existence of a possible alternate course of treatment, which 'may or may not' have been successful, is not sufficient to raise an inference of deliberate indifference where the prison officials acted reasonably but ultimately failed to avert the harm."  *Id.* at 1241.

Nor has Nelson shown that any delay of his surgery had a detrimental effect.  When a claim for deliberate indifference is premised on a delay in medical treatment, "the objective seriousness of the deprivation should also be measured by reference to the *effect* of delay in treatment.  To establish this effect, the inmate must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment."  *Laughlin*, 430 F.3d at 929 (quotations omitted); *see also Dulany*, 132 F.3d at 1243 ("The objective portion of the deliberate indifference standard requires a showing of

'verifying medical evidence' that the defendants ignored an acute or escalating situation or that delays adversely affected the prognosis given the type of injury in this case."). Nelson has not produced any medical evidence establishing that the delay in his hip surgery had a detrimental effect.[16]  *See Johnson v. Adams*, 452 Fed. App'x 708, 709 (8th Cir. 2012) ("And significantly, the record before the district court contained no medical evidence verifying that Johnson suffered any long-term detrimental effect from a delay in treatment.").  Without such evidence, he has "failed to raise a genuine issue of fact on an essential element of his claim."  *Laughlin*, 430 F.3d at 929; *see also Gibson*, 433 F.3d at 646; *Dulany*, 132 F.3d at 1243.

### 3.  Disagreement Over Treatment

The evidence in the record reflects that Nelson simply disagreed with the course of treatment prescribed by Dr. Loes or preferred an alternative course of treatment altogether.  "A prisoner's mere difference of opinion over matters of expert medical judgment or a course of medical treatment fails to rise to the level of a constitutional

---

[16] While the delay in the scheduling of his hip surgery is the gravamen of Nelson's deliberate-indifference claim with respect to his hip pain, Nelson also alleges that he did not receive certain anti-blood-clotting medication following his surgery, (Am. Compl. ¶¶ J, K; *see also* Nelson's Response at 6), and was refused "highly recommended" physical therapy, (Am. Compl. ¶ R; Nelson's Surreply at 31).  With respect to the physical therapy, there is no indication in the record that physical therapy was prescribed following Nelson's hip surgery.  Nelson simply asserts without any medical evidence that "[i]t's pretty obvious to even any layperson, that a patient would need some physical therapy after a total hip replacement surgery!  In fact it's always recommended and given after this particular surgery!"  (*Id.*)  As for the anti-blood-clotting medication, the record reflects that this medication was not provided until several days later.  In any event, however, Nelson has not provided any medical evidence indicating that he suffered any long-term effects from the delayed medication or the absence of physical therapy.  *Laughlin*, 430 F.3d at 929; *Johnson*, 452 Fed. App'x at 709.

     Similarly, Nelson contends that Dr. Loes interrupted Dr. Kruse's "prescribed treatment" of his hip following surgery.  (Nelson's Surreply at 47; *see also id.* at 37.)  Nelson has proffered no medical evidence of a post-surgery treatment plan.  Even if he had, the fact that such a plan was not followed to the letter *without more* does not demonstrate deliberate indifference.  *See Dulany*, 132 F.3d at 1239, 1243.  And, like allegedly the denied physical therapy and delayed anti-blood-clotting medication, Nelson has not provided any medical evidence—or even alleged, for that matter—any long-term effects as a result.  *Laughlin*, 430 F.3d at 929; *Dulany*, 132 F.3d at 1243; *Johnson*, 452 Fed. App'x at 709.

violation." *Meuir*, 487 F.3d at 1118-19 (quotation omitted). Even if, for example, Dr. Kruse would have scheduled Nelson's hip surgery sooner than Dr. Loes, the fact that another physician may have treated Nelson's migraines or hip pain differently does not mean that the courses of treatment pursued by Dr. Loes amounted to deliberate indifference.[17] *Dulany*, 132 F.3d at 1242.

Construing the evidence in the light most favorable to Nelson, the record shows that Nelson was seen on a continuing basis to address both his migraines and his hip pain. His complaints were not ignored. Dr. Loes tried many different remedies to address Nelson's ailments. The Court does not doubt that Nelson experienced no small amount of physical discomfort during this period of time and, while Nelson may have preferred alternative treatments or quicker results, these preferences do not mean the treatment he did receive was constitutionally inadequate. *See Logan*, 119 F.3d at 650. Based on the foregoing, it is hereby recommended that Dr. Loes's motion for summary judgment be granted in its entirety.

---

[17] In the Amended Complaint, Nelson alleges that Dr. Loes was "incompeten[t]" and committed malpractice when treating Nelson's migraines and hip pain. (*See, e.g.*, Am Compl. ¶¶ E, G, M.; *see also* Nelson's Response at 2 ("For instance the difference between malpractice and deliberate indifference is factual, and so can't be resolved in summary judgment state, and that means Plaintiff's case should go forward.")). In his surreply, however, Nelson states that he "is not bringing a malpractice suit against Dr. Loes obviously." (Nelson's Surreply at 14.) In any event, Nelson "has not filed any expert affidavit attesting to a medical expert's opinion that [Dr. Loes] 'deviated from the applicable standard of care and by that action caused injury to the plaintiff,' which under Minnesota law must accompany such an action." *Wales v. Tran*, No. 08-cv-39 (JNE/JJK), 2008 WL 4867699, at *3 (D. Minn. Nov. 4, 2008) (quoting Minn. Stat. § 145.682, subd. 3(a)); *see Flores v. United States*, 689 F.3d 894, 900 (8th Cir. 2012) ("Minnesota courts require strict compliance with the procedural requirements set forth in section 145.682."). Nelson's status as a pro se litigant does not exempt him from this requirement. *See* Minn. § 145.682, subd.5; *Wales*, 2008 WL 4867699, at *3. Without such an affidavit, any purported malpractice claim alleged by Nelson is barred under § 145.682. *See* Minn. Stat. § 145.682, subd. 6; *Flores*, 689 F.3d at 900; *Wales*, 2008 WL 4867699, at *3. Even without the affidavit requirement, Nelson's purported malpractice claims are barred as a matter of law "because he failed to present any evidence, expert or otherwise, that the allegedly ineffective care caused him an injury." *Senty-Haugen v. Goodno*, 462 F.3d 876, 891 (8th Cir. 2006). Finally, even if Nelson were able to sustain a medical malpractice claim based on the evens described herein, medical malpractice alone does not equate to deliberate indifference. *McRaven*, 577 F.3d at 982; *Popoalii v. Corr. Med. Servs.*, 512 F.3d 488, 499 (8th Cir. 2008).

### B.  Sheriff Stuart

Nelson also alleges that Sheriff Stuart was deliberately indifferent to his medical needs.  (Am. Compl. ¶¶ N, O.)  Nelson asserts that, because he was confined in Sheriff Stuart's jail, he was as much Sheriff Stuart's responsibility as Dr. Loes's.  (*Id.* ¶ N.) Additionally, Nelson states that Sheriff Stuart posted contact information for inmates to register complaints and, when Nelson complained about his medical treatment, he was told "they have no medical personnel on staff, so they can't do anything about medical complaints!"  (*Id.* ¶ O.)

Sheriff Stuart moves for summary judgment, arguing that Nelson has "not allege[d] that Sheriff Stuart personally did anything to him or failed to anything for him" and not "offered any evidence to support his claim that Sheriff Stuart is responsible for any of his alleged injuries."  (Sheriff Stuart's Mem. in Supp. of Summ. J. at 3.)

### 1.  Official vs. Individual Capacity

"Public servants may be sued under section 1983 in either their official capacity, their individual capacity, or both."  *Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999).  "[I]n order to sue a public official in his or her individual capacity, a plaintiff must expressly and unambiguously state so in the pleadings,  otherwise, it will be assumed that the defendant is sued *only in his or her official capacity*."  *Id.* (emphasis added).  "A suit against a public employee in his or her official capacity is merely a suit against the public employer."  *Id.*; *see also Uland v. City of Winsted*, No. 08-cv-2 (JNE/JJG), 570 F. Supp.2d 1114, 1119-20 (D. Minn. 2008) ("If no capacity is stated, the

claim is deemed to be against the person in an official capacity, which in turn means that the suit is one against the employing municipality.").

Sheriff Stuart asserts that, because Nelson "did not specify whether he is suing in [Sheriff] Stuart's individual or official capacity[,] . . . it must be assumed Nelson's suit is against the government employer—Anoka County." (Sheriff's Stuart's Mem. in Supp. of Summ. J. at 7.) This Court agrees. In the Amended Complaint, Nelson does not indicate whether he is suing Sheriff Stuart in his individual or official capacity. Because Nelson has not indicated whether he is suing Sheriff Stuart in his individual or official capacity, any claim against Sheriff Stuart "must be deemed an official-capacity claim." *Uland*, 570 F. Supp.2d at 1120; *see also Baker v. Chisom*, 501 F.3d 920, 923 (8th Cir. 2007) ("If the complaint does not specifically name the defendant in his individual capacity, it is presumed he is sued only in his official capacity." (quotation omitted)); *Johnson*, 172 F.3d at 535 ("Absent such an express statement [that the defendants are being sued in their individual capacities], the suit is construed as being against the defendants in their official capacity.").

Nelson responds that he "most definitely has" sued Sheriff Stuart in both his individual and official capacities. (Nelson's Resp. at 4; *see also* Nelson's Surreply at 6.) But Nelson relies on the proposed Second Amended Complaint. (Nelson's Surreply at 6 ("So Plaintiff 'absolutely did send' a 2nd Amended Complaint, and on this complaint it 'did specify that the Defendants were all *being sued in both their individual and official capacities*!")). As discussed in Section I, Nelson did not file a Second Amended Complaint after being given leave to do so and therefore the Amended Complaint

34

remains the operative complaint in this matter.  "While *pro se* complaints are construed liberally, *pro se* plaintiffs must still specifically assert individual-capacity claims." *Bailey v. Cnty. of Kittson*, No. 07-cv-1939 (ADM/RLE), 2008 WL 906349, at *5 (D. Minn. Mar. 31, 2008) (citations omitted); *see also Lopez-Buric v. Notch*, No. 00-cv-928 (ADM/RLE), 168 F. Supp.2d 1046, 1050 (D. Minn. 2001) ("[T]he extensive caselaw in this circuit on this issue is sufficiently clear to inform plaintiffs that if they wish to sue § 1983 defendants in their individual capacity, they must include unambiguous language noting that fact in their complaint.").

Moreover, even with the benefit of liberal construction, Nelson's Amended Complaint "sounds" in official capacity.  In the caption of the Amended Complaint, Nelson named Sheriff Stuart as "Sheriff James Stuart, Anoka County Sheriff."  (Am. Compl.)  Use of an official designation as opposed to an individual's name "can be construed as notice that [the defendants] are being sued in their official capacity and not as individuals." *Lopez-Buric*, 168 F. Supp.2d at 1050; *see also Baker*, 501 F.3d at 924 (defendants sued in official capacity where "caption was silent as to the capacities in which [the defendants] were named" and "body of complaint contained no 'clear statement' or 'specific pleading' of individual capacity").  Additionally, "[o]fficial-capacity suits typically involve either allegedly unconstitutional state policies or unconstitutional actions taken by state agents possessing final authority over a particular decision." *Bailey*, 2008 WL 906349, at *5 (quotation omitted).  Nelson's response to the summary judgment motions of Dr. Loes and Sheriff Stuart describes Sheriff Stuart as "a policy making authority, along with the County itself, relating to the proper operation of

the Anoka County Jail facility." (Nelson's Resp. at 5; *see also id.* at 3.) Nelson's surreply also contains citations discussing municipal liability and county sheriffs as policy makers. (Nelson's Surreply at 41.)

Based on the foregoing, the Court concludes that any claims brought against Sheriff Stuart must be deemed to be brought against him in his official capacity only.

### 2.  Anoka County/Municipal Liability

"A suit against a government official in his or her official capacity is 'another way of pleading an action against an entity of which the officer is an agent.'" *Baker*, 501 F.3d at 925 (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)); *see also Brockinton v. City of Sherwood*, 503 F.3d 667, 674 (8th Cir. 2007) ("A suit against a governmental actor in his official capacity is treated as a suit against the governmental entity itself."). "The real party in interest in an official capacity suit is the governmental entity and not the named official." *Baker*, 501 F.3d at 925 (quotation omitted). In this case, the governmental entity is Anoka County, Sheriff Stuart's employer. *See Scheeler v. City of St. Cloud*, 402 F.3d 826832 (8th Cir. 2005) (recognizing counties as "persons" within the meaning of § 1983).

Anoka County "cannot be held vicariously liable for its agent's acts under § 1983." *Brockinton*, 503 F.3d at 674; *see also Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999). "Rather, [Nelson] must identify a governmental policy or custom that caused [his] injury to recover from [Anoka County] under § 1983." *Brockinton*, 503 F.3d at 674 (quotation omitted); *see also Mettler*, 165 F.3d at 1204 ("[A] municipality may be liable for the unconstitutional acts of its officials or employees when those acts

implement or execute an unconstitutional municipal policy or custom."). Sheriff Stuart and Anoka County move for summary judgment, arguing (1) Nelson has not presented any evidence of an unconstitutional policy or custom, and (2) even if he could demonstrate the existence of an unconstitutional policy or custom, Nelson has not shown that the unconstitutional policy or custom caused the harm he is alleging.

### a. Identification of Official Policy or Custom

Nelson claims that Sheriff Stuart and Anoka County were deliberately indifferent to his medical needs. According Nelson's Amended Complaint the benefits of a liberal construction, the Court remains hard pressed to conclude that Nelson has identified any particular policy or custom of Anoka County which caused his alleged injuries. Nelson states in his Amended Complaint that he is including Sheriff Stuart "because he is also responsible since I was in his Jail and therefore also in his care." (Am. Compl. ¶ N.) Applying Nelson's reasoning, Sheriff Stuart's only connection to the matter at hand is his overall supervisory responsibility over Anoka County Jail. But "[r]espondeat superior is not applicable to § 1983 claims" and "a warden's general responsibility for supervising the operations of a prison is insufficient to establish personal involvement." *Ouzts v. Cummins*, 825 F.2d 1276, 1277 (8th Cir. 1987). In any event, Nelson's failure to even allege, let alone provide evidence of, a policy or custom of Anoka County which caused his alleged injuries is fatal to his claim. *See Moyle v. Anderson*, 571 F.3d 814, 817 (8th Cir. 2009) ("To establish municipal liability under § 1983, a plaintiff must show that a constitutional violation was committed pursuant to an official custom, policy, or practice of the governmental entity."); *Johnson*, 172 F.3d at 536 (summary judgment proper

where plaintiffs failed to allege facts or produce evidence showing injury was result of county policy or custom); *Uland*, 570 F. Supp.2d at 1119 (plaintiff's failure to allege injury was result of city custom/practice or official policy fatal to § 1983 claim).

### b. Practices Identified in Responsive Briefs

In his response and surreply, Nelson argues that he has identified "two different unconstitutional policies [that] interfered with adequate medical care": the manner in which medications were distributed at the Anoka County Jail and understaffing of the Anoka County Jail's medical unit. (Nelson's Resp. at 3; *see also, e.g.*, Nelson's Surreply at 7, 15, 32.) Although Sheriff Stuart and Anoka County are correct that these practices were identified for the first time in response to the motion for summary judgment and not pleaded/identified in the Amended Complaint, (Sheriff Stuart's Reply at 3), the Court will nevertheless consider them in the interests of completeness.

"[A] plaintiff must identify a governmental policy or custom that caused the plaintiff's injury to recover from a governmental entity under § 1983." *Brockinton*, 503 F.3d at 674 (quotation omitted). Nelson contends that he has identified two "policies" of Anoka County. "[A] 'policy' is an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Mettler*, 165 F.3d at 1204. But Nelson has not identified any *official* Anoka County policy with respect to either medication distribution or staffing.

Further, with respect to inmate health care, Sheriff Stuart and Anoka County have submitted uncontroverted evidence that the official policy of Anoka County is that "[c]orrectional health shall provide inmate health care services that meet or exceed

federal, state and local standards." (Sheriff Stuart's Ex. A.) "[A]n official policy speaks for itself about the intent of public officials." *Jenkins v. Cnty. of Hennepin*, 557 F.3d 628, 633 (8th Cir. 2009). "Under the Constitution, . . . the range of acceptable medical care is broad." *Id.*

Because Nelson has not identified official polices for medication distribution and staffing, the Court will consider whether these practices could be considered municipal customs. *See Mettler*, 165 F.3d at 1204. "A governmental custom involves a pattern of persistent and widespread practices which become so permanent and well settled as to have the effect and force of law." *Brockinton*, 503 F.3d at 674 (quotation omitted). Nelson must show the following to establish the existence of a municipal custom:

> (1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;
> (2) Deliberate indifference to or tactic authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and
> (3) The plaintiff's injury by acts pursuant to the governmental entity's custom, i.e., proof that the custom was the moving force behind the constitutional violation.

*Mettler*, 165 F.3d at 1204 (quotation omitted).

With respect to the medication distribution, Nelson has identified a *pattern of conduct*. Diane Haugen, the correctional health manager for the Anoka County Jail, confirms that medication is distributed to inmates three times per day; "[t]he first pass begins at 8:00 a.m., the second at 12:30 p.m., and the third at 8:00 p.m." (Haugen Reply Aff. ¶ 7.) Nelson argues that medication, in particular Imitrex, was not provided "at the

time needed, as the medicine was made and meant to be administered in order to be able to work as it is meant to work." (Nelson's Resp. at 3.) Failing to provide medication when needed, Nelson contends, causes unnecessary pain and suffering. (Nelson's Resp. at 5, 6, 7; *see also* Nelson's Surreply at 7, 15, 37, 41, 42, 49.)

Again, delay in the provision of medical care can amount to unconstitutional misconduct. *See Johnson-El*, 878 F.2d at 1055. But "delayed treatment is not unconstitutional unless it evinces deliberate indifference to serious medical needs." *Jenkins*, 557 F.3d at 628. Simply because treatment may have been more efficiently provided or would have been provided more quickly by a private physician is not enough to establish deliberate indifference. *Id.*; *see also Logan*, 119 F.3d at 650. As discussed above, there was no deliberate indifference to Nelson's migraine pain. And even if Nelson did not receive his medication in a timely manner, he has not shown that the Anoka County Jail's medication-distribution practice resulted in a widespread, persistent pattern of inmates not receiving medication on a timely basis and such delay resulting in the constitutional injury—whether via pain or adverse health effects—of deliberate indifference to medical needs.

Viewed in the light most favorable to Nelson, the record shows that Imitrex is to be taken at the start of a migraine and there were times when Nelson did not receive Imitrex at the start of migraine. (Indeed, this "timing" issue was one of the reasons Dr. Loes prescribed propranolol.) But this evidence only shows that Nelson did not always receive medications in a timely manner, not that this was a widespread problem at the Anoka County Jail. Further, Nelson has presented no evidence that Sheriff Stuart and

Anoka County were aware of any pattern of medication not being received in a timely manner. Until this lawsuit, Sheriff Stuart "had never heard of" Nelson. (Aff. of Sheriff James Stuart ¶ 8, Docket No. 88.) Nelson has not put forth any evidence indicating otherwise. Accordingly, Nelson has not shown that Anoka County's medication-distribution practice qualifies as a municipal custom for purposes of § 1983 liability.

As for the staffing of the Anoka County Jail's medical unit, the only evidence Nelson submits is the response to an April 18 grievance in which Nelson complained about not receiving his medication until 8:45 a.m., a delay of approximately 45 minutes from the regularly scheduled time. A "Nurse Chris" responded that Nelson's grievance was "noted" and there had "only [been] one nurse to pass meds" that day. (Nelson's Ex. Q.) First, this single incident is not enough to establish a custom.[18] *Jenkins*, 557 F.3d at 634; *Mettler*, 165 F.3d at 1205. Second, Nelson has presented no evidence that Sheriff Stuart and Anoka County were aware of inadequate staffing resulting in constitutionally deficient medical care to inmates. Thus, Nelson has likewise not shown that Anoka County's staffing practice qualifies as a municipal custom for purposes of § 1983 liability.

Therefore, because Nelson has not shown that Anoka County's medication-distribution and staffing practices amount to official policies or customs—a prerequisite to establishing municipal liability under § 1983, the Court recommends that the summary judgment motion of Sheriff Stuart and Anoka County be granted. *See Mettler*, 165 F.3d at 1204-06; *see also St. Martin v. City of St. Paul*, 680 F.3d 1027, 1032 (8th Cir. 2012)

---

[18] Nelson notes on Exhibit Q that he has "several grievances that state they are understaffed." (Nelson's Ex. Q.) But, as noted above, the time for submitting such evidence is now. *See supra* n.12.

"Summary judgment is appropriate where one party has failed to present evidence sufficient to create a jury question as to an essential element of its claim.").

## IV.

Based upon the file, record, memoranda, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Doctor Loes's Motion for Summary Judgment (Docket No. 93) be **GRANTED**.

2. Sheriff Stuart's Motion for Summary Judgment (Docket No. 80) be **GRANTED**.

Dated: February ___14___, 2014

_____*s/ Tony N. Leung*_____
Tony N. Leung
United States Magistrate Judge
for the District of Minnesota

*Nelson v. Stuart et al.*
File No. 11-cv-3143 (DSD/TNL)

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and by serving upon all parties written objections that specifically identify the portions of the Report to which objections are made and the basis of each objection.   This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals.   Written objections must be filed with the Court before **March 3, 2014**.